**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Cr. No. 21-CR-323 (CRC)** |
| | ) | |
| **DEANDRE POSEY** | ) | |
| | ) | |
| Defendant. | ) | |

_____

<u>**SENTENCING MEMORANDUM**</u>

Deandre Posey, though undersigned counsel, respectfully submits this memorandum

requesting that the Court consider his entire life and the various legal arguments made in this

sentencing memorandum in determining a fair and just sentence.  After the Court resolves the

Guidelines dispute, the applicable Guideline range will be 30 to 37 months.  As such, the

Government's allocution will properly be for 33.5 months as the plea agreement agrees to a cap

at the middle of the appropriate guideline range. Counsel also requests that Mr. Posey receive

additional credit for the over ten months of incarceration that he has spent at the D.C. Jail during

both a pandemic and conditions recently determined by the U.S. Marshals Service as unfit for

living.  Ultimately, counsel requests that this Court impose a sentence of 18 months of

incarceration and one year of supervised release.  An 18 months sentence is no greater than

necessary and would be consistent with the practice over several judges in the District who have

doubled credit for time-served during the pandemic.

<u>**Background**</u>

Mr. Posey is a 27 year old man and a father to a seven year-old son named Decari Posey.

His mother Donnette Posey was a single mother who is "proud of her son" and reports that Mr.

Posey is a "good father to his son."  At the time he was incarcerated, Mr. Posey was providing

financial support and was very active in six year old Decari's life.  He also helps raise William Holbrook, a twelve year old boy who is the son of Decari's mother and significantly contributes in raising his girlfriend, Kiana Parish's son.  Most conversations with Mr. Posey involve his child and his desire to get back to help raising him.

Although Mr. Posey has taken steps towards becoming a productive contributor to society, his efforts have been interrupted by periods of incarceration.  He was doing construction work at the time he was arrested but has also earned HVAC certification and a OSHA-10 certification.  He has also earned a GED.

Mr. Posey suffers from Post-Traumatic Stress Disorder from when his friend Kenneth Jackson was stabbed in the neck and died in Mr. Posey's arms on April 26, 2016.[1]  At the time he was arrested, Mr. Posey had initiated mental health services for treatment for his PTSD but services were delayed and had not yet begun.

Mr. Posey was arrested after he had accepted a proposition to purchase a firearm for protection at his home.  As a result of that ill-fated decision, he has been at the D.C. Jail for approximately ten months.  The time he has spent has been inordinately difficult.  The D.C. Jail has historically been a difficult place – and jail is not meant to be easy.  But life during the pandemic was initially a life of solitary confinement.  And once the restrictions were eased, things, amazingly became worse.  While individuals, some mentally ill, began to act out due to the oppressive conditions, correctional officers began to respond by punishing the entire jail population.

---

[1] The PSR incorrectly states that Mr. Posey has never suffered from any physical or mental health conditions.  He is currently taking Symbicort and Budensonide-Formoterol for asthma. He is also taking Trazadone for his Post-Traumatic Stress Disorder, as it alleviates his nightmares.  Treatment for PTSD requires Cognitive Behavioral Therapy.

Mr. Posey has pleaded guilty to the offense of Unlawful Possession of a Firearm.  Mr. Posey promptly accepted responsibility in this case despite an unusual factual scenario.  Here, the parties agree that Mr. Posey possessed a firearm for mere moments – he had bought the firearm from a confidential informant.  The parties also agree that he did not initiate the purchase of the firearm – that transaction was entirely initiated by the informant.  The informant initiated all seven calls that discussed the transfer of the gun. It is also undisputed that Mr. Posey never used the firearm.

This case arose on March 29, 2021 when a confidential informant called Mr. Posey in order to purchase marijuana.  The informant met Mr. Posey on March 30, 2021 and made a purchase.  During that meeting, "The CI examined the contents and remarked to Posey that the CI was going to trade it for a pistol."  ECF 1-1 at 3.  The CI again mentioned that he would trade marijuana for guns.  Then the CI "then said that it needed them (referring to guns), leading Posey to say he needed something too."  ECF 1-1 at 3.  The informant pushed the issue: "The CI then asked Posey whether he needed 'something' (referring to a gun), to which Posey replied, "hell yeah."  The CI said he would "check back with Posey." ECF 1-1 at 3-4.

On April 3, 2021, the same confidential informant called Mr. Posey to discuss a firearms transaction.  ECF 1-1 at 4. The informant then called twice on April 14, 2021.  Mr. Posey called back and the agreed to trade marijuana for a .40 caliber firearm.  The informant called Mr. Posey again on April 21, 2021 and informed him that a firearm would cost either $800.00 or 80 grams of marijuana.  Mr. Posey agreed to pay him in marijuana "if he did that." ECF 1-1 at 5.

The informant called Mr. Posey again on April 24 to discuss the transaction.  He called Mr. Posey two more times on April 26, 2021 finally agreeing upon a location to meet.  They met

an hour later and the informant gave Mr. Posey the gun.  He was arrested moments afterwards without incident.

## **ARGUMENT**

### **Sentencing Law**

Twenty years ago, the Supreme Court held that "the Federal Sentencing Reform Act of 1984…ma[de] the Guidelines effectively *advisory*."  *United States v. Booker*, 543 U.S. 220, 245 (2005).  Under *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing. " *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)).  While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the Supreme Court in *Booker* held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a).   Overall, in light of *Booker*, courts must treat the Guidelines as one among several of the sentencing factors.

Pursuant to 18 U.S.C. § 3553(a) – as explicitly endorsed by the Supreme Court in *Booker* – sentencing courts should consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified

purposes of sentencing:  just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).

In determining such a sentence, the sentencing court must consider the United States Sentencing Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense.  *Id*. § 3553(a)(1).  In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth.  *Id.* § 3661.

Congress has further provided that:

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*.

18 U.S.C. § 3582(a) (emphasis added).  With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]."  *Id*. § 3553(a) (emphasis added).

Since *Booker*, the Supreme Court reaffirmed that the Sentencing Guidelines are merely one factor to be considered by district courts when fashioning a reasonable sentence and that the Sentencing Guidelines are not to be weighed more heavily than other sentencing factors.  *See Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007).  A sentencing court shall not simply presume that a sentence within the Guideline range is automatically

reasonable or that a sentence within the Guideline range is more reasonable than a sentence outside of the Guideline range. *Rita*, 551 U.S. at 338; *Gall*, 552 U.S. at 46. The sentencing court further shall not presume that a sentence outside of the Guidelines range is unreasonable. *Id.* By considering the Sentencing Guidelines along with all of the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure." *Rita*, 551 U.S. at 351.  It is critical for sentencing courts to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court has long emphasized that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)); s*ee also United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *4-5 (D. Md. Feb. 18, 2020)("But if judges are not careful, a rote application of the Guidelines can turn what is often a life-defining moment for the defendant into a check-the-box, formulaic calculation devoid of the individualized sentencing we strive for.").

## I.    The guidelines calculation

### A.  The Guideline Range

The proper guideline range for Mr. Posey is 30 to 37 months.  To begin, the plea agreement submitted limits the government's allocution to the mid-range of the applicable Guideline range– provided because largely because Mr. Posey accepted responsibility as soon as the U.S. Attorney's Office first allowed.

Base Offense Level                        14

| | |
|---|---|
| In Connection with a Felony | +4 |
| Acceptance of Responsibility | -3 |
| Total | 15 |

With a Criminal History Score of IV, Mr. Posey's guideline range is 30 to 37 months.

**B. Mr. Posey's Criminal History Score is 9.**

The Presentence Investigation Report erroneously calculates Mr. Posey's Criminal History score in two ways. First, it scores 3 points for a 2012 Superior Court robbery from when Mr. Posey was 17, where Mr. Posey served 9 months of incarceration. PSR at ¶ 39. Second, it includes 1 point for a probation without adjudication. PSR at ¶ 40.

**1. Mr. Posey should have only been scored for 2 points for the 2019 Superior Court robbery.**

On August 10, 2012, Mr. Posey was sentenced to a robbery offense in D.C. Superior Court for crime he committed when he was seventeen years old. The Judgment and Commitment Order from the original sentencing hearing demonstrates that Mr. Posey was sentenced to 24 months, with execution of all but 9 months to be suspended. He was placed on Probation for 18 months, under the Youth Rehabilitation Act. Ex. A. On June 23, 2014, Mr. Posey was resentenced for violating probation. He lost the benefits of the Youth Rehabilitation Act and was sentenced to another 1 year of probation. He was not sentenced to any further term of incarceration. Ex. A at p. 2.

The Probation Office apparently misconstrues this language and concludes that Mr. Posey was actually sentenced to 18 months incarceration. But that is not reflected in the Judgment and Commitment Order. Exhibit A. In the June 23, 2014 Order, Mr. Posey is sentenced to 24 months incarceration, execution of sentence suspended as to all but 9 months, with **credit for time-served.** In other words, the 9 months that Mr. Posey had previously served

when he was originally sentenced was credited – no additional jail time was imposed.

If the Court needs further proof, it need look no further than the remainder of PSR ¶ 39 which reports that Mr. Posey was sentenced on June 23rd and released from custody on June 27th. Thus, Mr. Posey was not sentenced to another nine months, or even three additional months, triggering a third point in his criminal history score.  As the PSR reports, Mr. Posey had been released to the community on January 11, 2013.

2. **Mr. Posey should not have been scored 1 point for Attempted Possession of Marijuana in December 2013.**

Probation also incorrectly scores Mr. Posey for 1 point for a sentence of Probation without Adjudication of Guilty for which he received a sentence of 5 days of unsupervised probation. Probation defends its calculation by arguing that USSG §4A1.2 (f) requires counting "prior adult diversionary dispositions" if they involve a "judicial determination of guilt or an admission of guilt in open court." "This reflects a policy that defendants who receive the benefit of a rehabilitative sentence and continue to commit crimes should not be treated with further leniency."  PSR at p. 25.

First, the disposition of this case for Attempted Possession of Marijuana is not an adjudication of guilt and not a "rehabilitative sentence."  A rehabilitative sentence under D.C. law is a sentence under the D.C. Youth Rehabilitation Act, D.C. Code § 24-903.  That is not what happened at Mr. Posey's sentencing.  It appears that Mr. Posey entered into a global plea where he was adjudicated guilty for assaulting a police officer, see PSR ¶ 41 and given a Probation without Adjudication for the marijuana offense while simultaneously being sentenced to 60 days for misdemeanor assault on a police officer.  This was not a "rehabilitative sentence"

– it appears to be a sentence designed to avoid confusion by those calculating his sentence.[2]

Moreover, the offense of "attempted possession of marijuana" is akin to a Local Ordinance violation, Disorderly Conduct or Public Intoxication.  USSG §4A1.2 (c)(1)-(2). No such offense exists today and Mr. Posey is in fact eligible for expungement.  D.C. Code §16-803.02 because marijuana has since been legalized in the District.  D.C. Law 20-153, Legalization of Possession of Minimal Amounts of Marijuana for Personal Use Initiative of 2014.  In determining whether an offense is similar to the uncounted offenses under USSG §4A1.2, "[T]he court should use a common sense approach…." USSG §4A1.2, Comment 12(A). Attempted possession of marijuana is no longer an offense and thus carries no penalty, as a result it is not perceived as a serious offense, and the level of culpability for the offense does not even rise to the level of public usage.[3]

## II.     The Appropriate Sentence is Eighteen Months and one year of supervised release.

When sentencing a defendant, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider.  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a).  *Gall v. United States*, 552 U.S. 38, 50 (2007).  Because the Guidelines

---

[2] While it is impossible to discern precisely what the trial court intended, after Mr. Posey was arrested he was detained on the attempted possession of marijuana but not detained on the assault on a police officer (the D.C. Bail statute does not allow for preventative detention on misdemeanor offenses but does allow detention for violations of pretrial conditions of release). The two sentences were likely fashioned so that Mr. Posey would not lose credit for the time he spent incarcerated between May 11, 2014 and May 28, 2014. See PSR at ¶¶ 40 and 41. But for Guidelines purposes, the result appears to be an inflated criminal history score.

[3] Alternatively, Mr. Posey asks that the Court vary down from the Guideline range because attempted possession of marijuana is no longer a crime in the District.

merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita v. United States*, 551 U.S. 338, 348, 350 (2007). This Court should not presume that a Guidelines sentence is reasonable and should, instead, consider whether or not the applicable Guidelines sentence properly reflects § 3553(a) considerations and whether "the case warrants a different sentence regardless." *Id.* at 351. Indeed, "it remains the judge's duty to tailor every sentencing to the case and defendant at hand," regardless of the guidelines range. *United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014) (Gorsuch, J.). Recently, a U.S. District Court Judge explained the following:

> During the sentencing hearing, the lawyers and the judge discuss the appropriate sentence, often at great length, but after the judge announces a decision, that judge, the lawyers, and the staff move on to the next case; the hearing and outcome soon fade into distant memory. Meanwhile, for the defendant, the torture of a monotonous existence begins, while life for his family moves forward without him. For him, every day, month and year that was added to the ultimate sentence will matter. The difference between ten and fifteen years may determine whether a parent sees his young child graduate from high school; the difference between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family. *Thus, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence. Liberty is the norm; every moment of incarceration should be justified.*

*United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *3-4 (D. Md. Feb. 18, 2020) (emphasis added).

## A. The History and Characteristics of Mr. Posey

Mr. Posey is a 27 year old young man who is a dutiful son, a faithful father but has struggled to gain momentum in his young life. Although he has a criminal history score of 11 (including two points for being under supervision), 4 of those points are for misdemeanor

offenses. In general, his criminal history score significantly overstates his history.[4]

Mr. Posey made a substantial mistake when he was 17 years old and was convicted of Robbery. His next significant offense occurred around seven years later. He is likely to be sentenced to 18 months of back up time for that strong arm robbery offense.

Mr. Posey also suffers from Post-Traumatic Stress Disorder, a diagnosis he reported when he first entered the D.C. Jail. Although Mr. Posey sought treatment for this condition, he unfortunately had not begun treatment at the time of his arrest – likely because of suspended services due to the COVID pandemic. The combination of PTSD and the difficult conditions at the Jail during COVID has been recognized to be an exceptionally harmful condition, as outlined below. Mr. Posey has learned a harsh lesson in the past ten months. His poor judgment has led to the harshest form of modern day incarceration – essentially universal solitary confinement with first one hour of recreation time and now oscillating between one and five hours. He has not seen any of his family in ten months and he has suffered through unusually harsh conditions throughout his incarceration.

Mr. Posey has experienced violence first-hand, having watched a close friend get attacked and die in his arms. His medical issues, in part, stem from those tragedies. He suffers from Post-Traumatic Stress Disorder, an affliction that can be treated but cannot be cured. PTSD is better treated with therapy, although some medications have been found to help the depression that sometimes accompanies the anxiety disorder.  https://www.apa.org/ptsd-

---

[4] Mr. Posey objects to the PSR's characterization of the Assault on a Police Officer when he was 19. PSR ¶41. The PSR incorrectly states that Mr. Posey was responsible for "punching the officer in the back of the head, several times" and "proceeded to jump on the back of the officer and repeatedly strike the office in the head." Mr. Posey did assault a Special Police officer once in the face but all of other conduct was attributed to other individuals. Counsel has sent the Gerstein affidavit to the Probation Officer.

guideline/treatments/.

Throughout his recent adult life, Mr. Posey's issues seem rooted in his PTSD.   The

National Alliance for Mental Illness ("NAMI") notes that PTSD brings about "arousal

symptoms" – "Examples might include being intensely startled by stimuli that resembles the

trauma, trouble sleeping or outbursts of anger."   https://www.nami.org/About-Mental-

Illness/Mental-Health-Conditions/Posttraumatic-Stress-Disorder.

**1. COVID has made Mr. Posey's ten-month period of incarceration exceptionally harsh.**

Along with Mr. Posey's desire to piece together his life and change the trajectory of his

path, Mr. Posey has faced the horror and fears of the COVID-19 pandemic.  The time he has

spent at the Jail may not have been intended to be punitive – but to him, had the impact of

feeling punitive.  He has been in, in practical terms, a form of solitary confinement or protective

custody for several months.  In between the days that appeared to seem normal, he had periods of

quarantine.  Back and forth he went from regular population to quarantine.  In his one hour of

"rec time" per day, he has to shower, call his family or lawyer and get "exercise" – often late at

night or early in the morning when his family was asleep.  For 23 other hours, he remained

confined to his cell.  He does not always received the legal calls that have been requested so he

had to call counsel during his one hour of recreation time.

Courts have begun to recognize the abysmal conditions that incarcerated individuals like

Mr. Posey must bear and are adjusting sentences accordingly.  Judge Amy Berman Jackson was

confronted with an individual with mental health issues:

> But you have to factor into the analysis the fact that 6 months of the 12 he served
> were served during the pandemic.  So that wasn't any regular jail sentence.  That
> was a hard six months.  I can't ignore the fact that the time he spent awaiting
> sentence in D.C. Jail was not the same experience he would have had a year or
> even six months ago when defendants who were involved in programming there

> asked me to delay their sentences so they could stay and complete them.
>
> Almost his entire experience has been overshadowed by the specter of the virus, the need for isolation, less contact with counsel, less contact with family, less opportunity to move within the facility, and constant worry.  And the worry has been particularly acute for this defendant with his history of mental health issues and anxiety, and his worst fears came true when he was diagnosed with the virus while detained in what was at that time a petri dish for the spread of infection.
>
> In other words, this defendant has experienced harsher conditions and more limited opportunities while he was incarcerated, and that's analogous to when we depart for immigrants who weren't allowed to participate in programs.  And so I feel like if I'm giving him credit for that portion of the time he already served, those six months should count more, maybe even double.

*United States v. Michael Cowan¸* 18-cr-208 (ABJ) (Transcript of Sentencing Hearing, Sept 18, 2020 at 30-31); *see also United States v. Chris Carroll,* 20-cr-16 (JEB) (opining that crediting defendant for double the time served is appropriate when incarceration is during the pandemic.).

According to medical and mental health professionals, "[i]ndividuals suffering from serious mental illness can have compromised immunity and are at risk of severe illness and death during the coronavirus pandemic."  See Ex. B (Inst. Of Law, Psychiatry, and Public Policy, Univ. of Va. Let. (Mar. 24, 2020)).   Individuals like Mr. Posey, with a history of mental illness, "may become more fearful, agitated, and/or paranoid as a result of being quarantined to their jail cells for prolonged periods," which may substantially diminish their abilities to care for themselves in the prison environment.  *Id.*  This is, in part, why "mental illnesses such as anxiety [and] depression . . . impair immune function and heighten vulnerability to viral infection."  *See* Ex. C (Sapolsky Decl.) at ¶13; *see also Doe v. Barr*, 2020 WL 1820667, at \*4 (N.D. Cal. Apr. 12, 2020) ("[g]rowing evidence demonstrates that . . . anxiety/stress, and depression can lead to decreased immune response and increased risk of infections").  As courts have recognized, "a defendant's *mental* health needs may also be the basis for granting compassionate release."  *Johnson*, 2020 WL 1546422, at \*10 (emphasis in original).  "[T]he challenges of self-care inside a prison where COVID-19 is raging would be especially severe for someone [like Mr.

Posey] who suffers from [substantial mental health illnesses] in addition to his physical vulnerabilities." *Id.*

Mr. Posey faces an increased risk of worsening his mental health, falling seriously ill, or dying in prison due to the rapid spread of COVID-19. Those with a history of mental health conditions, like Mr. Posey, face ever-growing health concerns as the WHO and other experts warn of an impending mental health crisis related to COVID-19.[5]  It comes as no surprise that COVID-19 is having a serious impact on mental health, with people reporting higher incidents of stress, anxiety, and other mental health concerns.[6]  Individuals with pre-existing mental health conditions like anxiety, depression, or *PTSD* may see their symptoms worsen due to stress caused by the pandemic.[7]  This is especially true for prisoners who now have even less access to mental health support and other resources because of the pandemic.[8]

"There is a well-established 'bi-directional' relationship between many serious mental illnesses [including PTSD] and infectious diseases." *See* Ex. D, Keller Decl. at ¶ 15.  "[M]ental

---

[5] *See, e.g., Substantial Investment Needed to Avert Mental Health Crisis*, WHO (May 14, 2020), https://www.who.int/news-room/detail/14-05-2020-substantial-investment-needed-to-avert-mental-health-crisis; Norm Ornstein et al., *The Coming Mental-Health Crisis: Congress Must Rethink the American Approach to Mental-Health Care During the Pandemic*, The Atlantic (May 14, 2020), https://www.theatlantic.com/ideas/archive/2020/05/coming-mental-health-crisis/611635/ (Four in 10 report that worry or stress related to COVID-19 had led to sleep problems.  "Others reported that the coronavirus had caused them to experience a variety of health-related ills, such as frequent headaches or stomachaches and increased alcohol or drug use.  If these problems are not addressed now, they may fester and worsen in the future.").

[6] *See, e.g.*, Alvin Powell, *Feeling More Anxious and Stressed? You're Not Alone*, The Harvard Gazette (Apr. 16, 2020), https://news.harvard.edu/gazette/story/2020/04/rising-mental-health-concerns-in-the-coronavirus-era/.

[7] Anna North, *Coronavirus is Causing a Mental Health Crisis. Here's How to Fight It*, Vox (Apr. 16, 2020), https://www.vox.com/identities/2020/4/16/21219693/coronavirus-anxiety-depression-mental-health-ptsd-COVID.

[8] *See* Christie Thompson, *For Mentally Ill Defendants, Coronavirus Means Few Safe Options*, The Marshall Project (May 15, 2020), https://www.themarshallproject.org/2020/05/15/for-mentally-ill-defendants-coronavirus-means-few-safe-options.

illnesses such as anxiety, depression, and bipolar disorder *will* impair immune function and heighten vulnerability to viral infection." Ex. C, Sapolsky Decl. at ¶ 13 (emphasis added).[9]  As a result, people "with serious mental illnesses are more likely to become infected . . . . And if infected they are more likely to suffer serious complications or die."  Ex. D  Keller Decl. at ¶ 15.

There is also a vicious cycle involved with mental illness and COVID-19: "physical illness can significantly exacerbate an individual's mental illness, which in turn leaves the person more vulnerable still."  *Id.*  Trauma begets more trauma, as "the more trauma a person experiences, the more vulnerable they become to future trauma."  *Id.* ¶ 32.  Because of this, among those affected by the COVID-19 crisis, "its impact will be felt hardest by individuals already suffering from serious mental health conditions including generalized Anxiety Disorder, Major Depressive Disorder and PTSD…."  *Id.*

Each day in custody poses great dangers to Mr. Posey. Any incarceration will be like his present incarceration - he will be housed in close quarters and forced to eat, bathe, and perform all daily life activities in a communal setting where he cannot adequately social distance or protect himself from this dangerous disease.  He will depend on others for protective equipment and even more others to properly use the equipment.  Bad as these conditions are for every prisoner, they are "especially severe for someone who suffers from PTSD," and even worse for someone not receiving his prescribed PTSD medications.  *See United States v. Johnson*, No. 15-cr-125-KBJ, 2020 WL 2515856, at *10 (D.D.C. May 16, 2020) ("[O]ne can only imagine that the challenges of self-care inside a prison where COVID-19 is raging would be especially severe for someone who suffers from PTSD in addition to his physical vulnerabilities.").

---

[9] Stanford Professor Robert Sapolsky submitted this declaration in *Arevalo v. Decker*, No. 2:20-cv-2982, ECF No. 3, Ex. 3 (S.D.N.Y. Apr. 13, 2020).  Professor Sapolsky did not consult with counsel for purposes of this litigation.

Courts have recognized the challenges faced by incarcerated individuals with mental health conditions during the pandemic in granting their compassionate release. *See, e.g.*, *Johnson*, 2020 WL 2515856, at *10 ("The Sentencing Commission's policy statement also plainly indicates that a defendant's *mental health* needs may also be the basis for granting compassionate release, and this Court further finds that Johnson's diagnosed PTSD makes his release request especially compelling."); *Doe v. Barr*, No. 20-cv-02141, 2020 WL 1820667, at *4, *9 (N.D. Cal. Apr. 12, 2020) (ordering the release of a foreign national, detained in a county jail, in part because he suffers from PTSD and "[g]rowing evidence demonstrates that PTSD, anxiety/stress, and depression can lead to decreased immune response and increased risk of infections" and thus "compound his susceptibility" to COVID-19).

### 2.   Mr. Posey has lived through the worst of times at the D.C. Jail.

On November 3, 2021, the U.S. Marshal announced that federal inmates will be moved from the D.C. Jail because of "systemic failures" and "egregious" conditions. https://www.washingtonpost.com/local/legal-issues/dc-jail-conditions-inspection/2021/11/03/c75d08ea-3c27-11ec-bfad-8283439871ec_story.html (last accessed Feb. 23, 2022). For some unknown reason, Mr. Posey was not one of them. The Washington Post reported then:

> In parts of the jail, water "had been shut off for days" as punishment, creating an "overpowering" stench from "standing human sewage" in toilets of many cells, Ruffin wrote. "Hot meals" were "served cold and congealed"; some inmates had "observable injuries" for which no documentation was available; and "evidence of drug use was pervasive," including the "widespread" odor of marijuana.
>
> Staff members were "observed antagonizing detainees," telling them not to cooperate with the inspection, Ruffin said, while jail supervisors "appeared unaware or uninterested in any of these issues."

*Id.*

Any defense lawyer who has worked in the District has heard versions of these complaints over the years.  But over the past year, clients consistently have reported that the Jail is worse than it has ever been.  Morale among the correctional staff has been exceptionally bad, both because of the risks that their jobs pose and also because of the additional burden created by more restrictions and sick colleagues.  The same staff then encounter individual residents who themselves are in crisis, having to cope with social isolation and the lack of movement.  Residents who previously could handle incarceration were left alone for so long that they talked to themselves and lashed out at the staff who interacted with them very briefly.  And through all of this was a fear that pervaded through residents like Mr. Posey and the staff – whom return to their families and learn of how dangerous the coronavirus was when you are unable to stay socially distant.

The result has been what the Marshals Service saw.  The staff found different ways to punish people at the Jail, whether they were deserving or not.  The residents retaliated in their own ways and the cycle continued. But as a result, Mr. Posey has spent ten months persevering through inhumane conditions that warrant an additional variance.

**B.  The Nature and Circumstances of the Offense**

Mr. Posey's Offense Level is elevated because he possessed the firearm in relation to the Distribution of Marijuana.  Although Mr. Posey acknowledges the seriousness of his crime, it is also true that Mr. Posey was subject to a four point enhancement for one of the less serious felonies that exist.  There are few felonies that would carry as little incarceration time as the marijuana offenses.  The weight of marijuana would result in a base offense level of 6 (4 with acceptance of responsibility).

The circumstances of this Offense provides an additional basis for this Court to vary

substantially from the Guideline range.  Most 922(g) defendants that come before this court are people who regularly carry guns and contribute to an increasingly dangerous society where gun violence has persisted.  Most are outside in neighborhoods with firearms and many run from police when investigated, creating additional danger.  In contrast, Mr. Posey bought the gun for in-home protection and there is no evidence that he had any interest in walking the streets with a firearm.

Moreover, this is not a violent offense, as a matter of fact or law, as "[n]either the act of possessing a weapon nor the fact of being a felon is in itself a crime of violence."  *United States v. Gloster*, 969 F. Supp. 92, 98 (D.D.C. 1997); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2197 (2019)("possession of a gun can be entirely innocent."); *Johnson v. United States*, 135 S. Ct. 2551, 2563 (2015) (J. Thomas, concurring)("Under conventional principles of interpretation and our precedents, the offense of unlawfully possessing a short-barreled shotgun does not constitute a "violent felony" under the residual clause of the Armed Career Criminal Act (ACCA)."); *Staples v. United States*, 511 U.S. 600, 611 (1994).  Therefore, imprisonment for the purpose of incapacitation is similarly not necessary or warranted.

The crime of gun possession is not a crime of violence.[10]  In 2018, 21% of this District's court docket were felon in possession cases,[11] compared to 10% nationwide.[12]  Unlike the often

---

[10] "The federal court for the District handled 392 criminal cases of all kinds in 2018, including 83 felon-in-possession gun cases and 16 gun-related interstate robbery cases, according to court records and prosecutors." Washington Post Article, also available at https://www.washingtonpost.com/local/legal-issues/us-to-prosecute-districts-armed-ex-convicts-in-federal-court-in-surge-against-gun-violence/2019/02/05/1f518926-2363-11e9-90cd-dedb0c92dc17_story.html (last viewed on March 9, 2020).

[11] See footnote 1, supra.

[12] Nationwide, gun possession offenses represented approximately 10% of the crimes reported to the U.S. Sentencing Commission in FY 2018.  See U.S. Sentencing Commission Quick Facts Felon in Possession FY 2018, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Felon_In_Possession_FY18.pdf (last viewed March 9, 2020).

egregious conduct that has been prosecuted in federal court, Mr. Posey's case is one that had

been in Superior Court without exception until three years ago.

Lastly, while it is the U.S. Attorney's Office's prerogative to prosecute gun cases

federally, its oft-repeated argument that long sentences for gun crimes protect the community is

made without evidence.  Since the Felon in Possession Initiative has been employed nearly three

years ago, gun violence, including homicides, has only increased.  As it turns out, the age-old

American plan of over-incarcerating individuals has had no positive impact on the safety of the

community.

### C.  The Need for the Sentence Imposed

18 U.S.C. § 3553(a) directs the Court to consider four objectives of federal sentencing to

impose a sentence that is "sufficient, but not greater than necessary" to achieve those goals.  The

first purpose is to "reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

Another purpose of sentencing is to "afford adequate deterrence." *Id.* at § 3553(a)(2)(B).

While "[p]rison is an important option for incapacitating and punishing those who commit

crimes," evidence shows that lengthy prison sentences do not have a "chastening" effect and

"produce at best a very modest deterrent effect."  *Five Things About Deterrence*, Nat'l Inst.

Justice, U.S. Dep't of Justice (May 2016) at 1-2.  Research shows conclusively that "[t]he

*certainty* of being caught is a vastly more powerful deterrent than the punishment," that

"[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime,"

and that "[i]ncreasing the severity of punishment does little to deter crime."  *Id.* (emphasis in

original).  Significantly, "the crime prevention benefit falls far short of the social and economic

costs," *id.* at 2, especially in light of the fact that U.S. Sentencing Commission "research has

demonstrated that reductions to sentence length and time served do not harm public safety,"
*Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections,
Urban Inst. (Jan. 2016) at 21.  *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative*
*Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardoza J. Conflict Resolution
421, 447-48 (2007) ("Certainty of punishment is empirically known to be a far better deterrent
than its severity.

**D. A Guideline Sentence Would Create an Unwarranted Sentencing Disparity Because Sentences During the COVID-19 Pandemic Have Typically Varied Under the Guidelines.**

This Court would create an unwarranted sentencing disparity if it followed the
government's recommendation.  This Court must consider the "need to avoid unwarranted
sentence disparities among defendants with similar records who have been found guilty of
similar conduct." 18 U.S.C. § 3553(a)(6). Whether any difference among sentences is warranted
or unwarranted depends on the individual circumstances of each case and their relationship to the
purposes of sentencing. "Unwarranted disparity is defined as different treatment of *individual*
offenders who are similar in relevant ways, or similar treatment of *individual* offenders who
differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n,
*Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal*
*Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).

Over the last five years, courts have been increasingly imposing non-government
sponsored below guideline sentences in firearm cases.  *See* Quick Facts, Felon in Possession of a
Firearm  https://www.ussc.gov/research/quick-facts/section-922g-firearms, In 2017, courts
imposed non-government sponsored below guideline sentences in nearly 25 percent of these
cases.  *Id.*  Of those offenders who received a non-government sponsored below guideline

sentence, the average reduction was approximately 33%. *Id.*

Moreover, when looking at the subcategory of 922 (g) cases *during the pandemic*, judges in this Court have varied substantially from the Guidelines, particularly in 922 (g) cases. In *United States v. Simmons*¸19-cr-409 (KBJ), the Court varied and sentenced the defendant to time-served in a 922 (g) case where the guideline range was 12 to 18 months and the defendant agreed he possessed an actual firearm. In *United States v. Juamal Carroll,* 19-cr-407 (ABJ), the Court varied and sentenced the defendant to 18 months, concurrent to a expected nine month sentence for violation for supervised release where the guideline range was 30 to 37 months. And in *United States v. Christopher Carroll*, 20-cr-16 (JEB), the Court varied and sentenced the defendant to a sentence of a year and one day where the guideline range was 30 to 37 months. In *United States v Tyeree Young*¸19-cr-366 (TSC), the Court varied to a time-served sentence (approximately two weeks) where the Probation Office had calculated an 18 to 24 months guideline range. In *United States v. Antone Watkins*, 20-cr-19 (CRC), the Guideline Range was 30 to 37 months and this Court sentenced him to 14 months. All of these sentences were for 922 g offenses. The Government's recommended sentence would thus create a sentencing discrepancy for a 922(g) case during the pandemic.

In addition to the below guideline sentences that have been imposed, the U.S. Sentencing Commission (U.S.S.C.) has also identified stark racial discrepancies in sentences that cannot be attributed to differences in criminal history or crime characteristics. The U.S.S.C. attributes a significant amount of the discrepancy to judicial discretion, finding that the court grants White defendants sentences that are below their guideline range at a higher rate than Black defendants. According to the U.S.S.C., "Black male offenders received longer sentences than similarly-situated White male offenders" by an average of 19.1 percent. *See* U.S. Sentencing Comm'n,

DEMOGRAPHIC DIFFERENCES IN SENTENCING: AN UPDATE TO THE 2012 *BOOKER* REPORT, 2 (2017), found at https://www.ussc.gov/research/research-reports/demographic-differences-sentencing

For firearms offenses since 2012, Black men received sentences that were on average 19.3 percent longer than similarly positioned White men.  *Id.* at 29.  The U.S.S.C. found that "non-government sponsored departures and variances" were a major contributor to the discrepancy, stating that "Black defendants were 21.2 percent *less* likely to receive a non-government sponsored downward departure or variance." *Id.* at 2.  When Black defendants did receive a variance, their sentences were was 16.8% longer than those of similarly situated white male offenders.  Therefore, consistent with the higher rates of downward departures given to similarly situated White defendants for similar violations, Mr. Posey should receive a variance – a sentence below the calculated guideline range.

III.   **The Kind of Sentence Available and the Sentencing Range Hinge on Overstated Guidelines Calculations and Thus Warrants a Sentence Lower than Recommend.**

   A.   **Reliance on Guideline Calculations Needs to be Adjusted to Meet the Needs of Society During this Time of Crisis in Our Country.**

At approximately two years into the COVID-19 pandemic, and this Court's ninety-some week or so weeks into limited operations, and little to no in-person court proceedings, COVID-19 continues to spread and kill thousands in this country.  Mr. Posey' reality is that he is among the demographic that has most been affected - he represents the low-wage, high risk, African-American that has consistently been reported to be among those at highest risk of contraction. https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html (last accessed February 23, 2022).   Mr. Posey is fully vaccinated but he is also asthmatic and suffers from PTSD.  Despite being fully vaccinated, he has already once contracted COVID while

incarcerated.  He has also had to repeatedly quarantine during the past ten months.

Initially, Congress has approved the reduction of the prison population to lessen the dangers of COVID-19.  The purpose of the CARES Act, which was passed by Congress with unanimous bipartisan support and signed into law by the President on March 27, 2020, is to "[p]rovid[e] emergency assistance and health care response for individuals, families and businesses affected by the 2020 coronavirus pandemic."  In the Act, Congress expressed its view that, in response to the pressures of the pandemic, the federal prison population should be reduced by expanding BOP's authority to release inmates to home detention.[13]   In response to discomfort about the accuracy of BOP's reporting of numbers, senators have also responded by introducing legislation called the "Corrections Data Transparency Act."

https://www.warren.senate.gov/imo/media/doc/COVID-19%20in%20Corrections%20Data%20Transparency%20Act%20(ALB20B54)%208.5.20.pdf.

**B.  In addition to mental health concerns, a sentence of incarceration in a Bureau of Prisons facility is inappropriate for Mr. Posey, particularly during the pandemic.**

In addition, a sentence of incarceration would subject Mr. Posey to a much more punitive sentence than is contemplated by 18 U.S.C. 3553.  If the Court follows the government's recommendation, Mr. Posey will effectively continue to be in the solitary confinement that crippled him for over the past ten months.  Currently, every one of the BOP's 98 facilities are under "Intense Modification Levels."  https://www.bop.gov/coronavirus/ (last accessed Feb. 23, 2022).  These modifications limit movement, programming, phone calls and showers.  Thus, for

---

[13] *See United States v. Copeland*, 2:05-cr-135-DCN (D.S.C. March 24, 2020) ("Congress has expressed its desire for courts to 'use all available powers and authorities … to reduce the number of federal prisoners in . . . prisons,' especially individuals like defendant" who had underlying conditions).

the foreseeable future, Mr. Posey will not have access to any of the programs that would ostensibly rehabilitate him.  He will live in fear – fear of infection every time he gets a meal, every time a correctional officer approaches him, every time he showers, uses the phone or has his limited of recreation time.

In addition, Mr. Posey will have to repeat his trauma of COVID-19.  He will enter a new facility under quarantine.  He would then enter yet another facility.  And he would start anew the grave risk of contracting COVID-19. He will face the same anxieties through which he has suffered, the lack of social distancing, the shared toilets, sinks, showers and phones.  And this time, he would do it far from his loved ones.  These conditions have fueled the spread of COVID-19 throughout BOP facilities – 285 people have died and 55,572 individuals have had the virus.  https://www.bop.gov/coronavirus/index.jsp (last accessed Feb. 23, 2022). Nationwide, more than 575,916 people have contracted the virus and 2,844 people have died in prisons.  https://covidprisonproject.com/  (last accessed Feb. 23, 2022).

A Forbes report illustrates how the BOP has bartered safety from the virus for hard time:

> According to a recent report by Unlock The Box, the United Nations Revised Standard Minimum Rules for the Treatment of Incarcerated People "Mandela Rules" identify solitary beyond 15 days as a form of cruel, inhumane, and degrading treatment that often rises to the level of torture. One would probably assume that the use of solitary confinement, no matter how cruel, would be reserved for the most hardened criminals who have resorted to violence in prison. But men and women in federal prison camps, who have done nothing more than be exposed to Covid-19, are now being locked up for extended periods of time.
>
> FCI Otisville (New York) satellite camp has had its minimum security camp inmates locked up in cells since mid-June, already twice the United Nations standard for cruel and inhumane. It is also the second such lock-up these inmates have experienced since April 2020 when the camp put people in quarantine after being told that they would be transferring to home confinement. After weeks locked in cells, many of them were told that they would not be going home but would resume their sentence back at the camp which was declared Covid-19-FREE. A few weeks later, a positive Covid-19 test led to the return to quarantine in the higher security prison cells. In situations like this, it means that if one other

24

> thing goes wrong it could spell disaster ... which made the hardship of a water-main break at the facility on July 15 that much more difficult. Men locked in those cells had no ability to flush the toilets for part of the day. This also meant that they could not drink the water from the sinks in the cells, but most would not do so anyway because of the filth of the plumbing and the uncertainty of the water's quality (inmates are given two 16-ounce bottled waters each day.

https://www.forbes.com/sites/walterpavlo/2020/07/16/bureau-of-prisons-using-solitary-confinement-as-a-means-to-curb-covid-19-contagion/#620449e1193a

In at least acknowledging the principle that the prison population needs to be reduced in light of the pandemic, even the Department of Justice has taken some action.  On March 26, 2020, Attorney General William Barr directed that the Bureau of Prisons (BOP) prioritize the use of home confinement in response to the COVID-19 pandemic.  *See* Memorandum for Director of Bureau of Prisons, April 3, 2020, available at https://www.justice.gov/file/1262731/download (last viewed on April 30, 2020).  Eight days later, on April 3, 2020, Attorney General William Barr requested that the BOP *increase* the use of home confinement for inmates most affected by COVID-19.  *See* Memorandum for Director of Bureau of Prisons, April 3, 2020, available at https://www.justice.gov/file/1266661/download  (last viewed on April 30, 2020).

To be clear, all correctional institutions have become hotbeds for the spread of the virus, simply because of their very nature and the inabilities of inmates to maintain social distancing and to acquire protective equipment.  But another main reason that the BOP has suffered from increased numbers is because of the BOP's internal policies:

> The BOP ignored health guidelines. Correctional officers who had been exposed to the virus were required to work despite a dearth of protective equipment. The BOP transfers inmates around the country, potentially spreading the virus. BOP labor factories, in which prisoners work for as little as 86 cents a day, are operational.
>
> Natalie Chwalisz, "*The Federal Bureau of Prisons Response to the coronavirus has been disastrous and deadly.*"  https://www.washingtonpost.com/opinions/local-opinions/the-federal-bureau-of-prisons-response-to-the-coronavirus-has-been-disastrous-and-deadly/2020/08/06/3d30464c-d65b-11ea-aff6-220dd3a14741_story.html

Due to the developing nature and effect the COVID-19 pandemic, the Courts, the Department of Justice, and Congress have acted to reduce the prison population.  The Sentencing Commission should yield as well.  This Court can impose a different sentence if it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."  18 U.S.C. § 3553(b).  The COVID-19 pandemic presents a mitigating circumstance not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.

For these reason, Mr. Posey requests a downward variance.  The kind of time that the Bureau of Prisons has to offer is not correctional or rehabilitative – indeed, the programs that could theoretically be used for rehabilitative purposes, do not presently exist.  Incarceration is wholly unnecessary given both the current realities of the Bureau of Prisons and the lessons that Mr. Posey has already learned.  Mr. Posey has demonstrated that he accepts responsibility.  He is also facing an additional 18 months of incarceration in Superior Court.  He understands what he needs to do and can comply with conditions of supervision and would not violate supervised release.

### C.  U.S.S.G. § 2K2.1 Does Not Embody § 3553(a) Considerations or Result in Sentences That Might Achieve § 3553(a)'s Objectives.

When the Guidelines were first promulgated in 1987, to create a guideline for unlawful firearm possession, the Sentencing Commission attempted to "synthesiz[e] a coherent rationale that generally explain[ed] and [was] reasonably consistent with current sentencing practice." USSC, *Supplementary Report on The Initial Sentencing Guidelines and Policy Statements*, 18 (1987).  The Commission acknowledged that there were not enough statistically-significant patterns for sentencing prohibited firearm possession to create a clear guideline, noting that its

"detailed statistical analyses . . . were of little value in explaining or rationalizing current sentences." *Id.* Although the Commission found that pre-Guidelines sentences had statistically-irrelevant ranges likely because of "the wide variety of circumstances under which these offenses occur," the Commission found that the "*actual or intended use* of the firearm was probably the most important factor in determining the sentence." U.S.S.G. § 2K2.1, cmt. background (1987). The Commission created guideline § 2K2.1 with a base level of 9 points, reduced to 5 if the firearm was possessed for lawful sporting use, or enhanced if the firearm was used in another offense. *See* U.S.S.G. § 2K2.1(a) (1987). Today, because of amendments made in 1991, a defendant's actual or intended use of the firearm plays no role in determining the Guideline range. Instead, prior criminal history and type of weapon are largely determinative. Moreover, under today's guidelines, a base offense level of 14, which is in Zone D, rarely allows a defendant to be sentenced to serve a non-prison term.

In 1989, the Commission increased the base offense level by 3 points, from 9 to 12, U.S.S.G. § 2K2.1(a) (1989), to reflect an increase in the statutory maximum penalty for unlawful firearm possession, which Congress doubled from 5 to 10 years in the Anti-Drug Abuse Act of 1988, *see* U.S.S.G. app. C, amend. 189, 100-101 (1989).

Then, in 1991, against the weight of empirical evidence collected from 1987 to 1990, the Commission completely erased and replaced the firearms guidelines. Similar to the now-discredited drug guidelines, the Commission dramatically increased the penalties proscribed under § 2K2.1 "in light of the Congressional sanction of a minimum 15 years for a prohibited person with three prior felonies of violence or controlled substance offenses." 1990 Commission Report 19. To create a framework "proportional" to the ACCA, the Commission doubled the base offense level for a defendant with two prior crimes of violence or controlled substance

offenses, from 12 to 24, effectively increasing the penalties prescribed for such defendants six-fold. *See id.* 19-23.

Since the Commission looked to the mandatory minimum ACCA sentence to create the firearm guidelines, and ignored "empirical data and national experience," the § 2K2.1 provisions "do not exemplify the Commission's exercise of its characteristic institutional role" or "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough*, 552 U.S. at 109 (internal quotation marks and citations omitted); *see also Gall*, 552 U.S. at 46 & n. 2. Instead, as demonstrated in this case, the Guidelines drastically overstate the seriousness of the offense by ignoring relevant considerations, such as the nature and circumstances of Mr. Posey' arrest, the current pandemic, and the need for society to have individuals like Mr. Posey successfully reenter society.

Like in *Gall*, "[a]ny term of imprisonment in this case would be counter effective by depriving society of the contributions of the Defendant who . . . understands the consequences of his criminal conduct and is doing everything in his power to forge a new life." 552 U.S. at 44 (citation omitted) (quoting district court). Mr. Posey requests a sentence of eighteen months, in order to begin the next stage of his life and to secure his productive place in the community. The requested sentence is not greater than necessary, and is sufficient for the purposes of sentencing.

## Conclusion

A sentence of eighteen months followed by a term of supervised release is a serious consequence that will more than adequately punish Mr. Posey for his particular conduct and will also adequately deter any future wrongful conduct. Thus, for the reasons stated above, including Mr. Posey's history and characteristics, together with the other goals of sentencing, Mr. Posey respectfully requests that the Court impose a sentence of eighteen months to be followed by a

term of supervised release.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
EUGENE OHM
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500